Filed 9/9/13  P. v. Moncrea CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B238470 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA088032) |
| v. | |
| ANTHONY DAWAYNE MONCREA, | **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING** |
| Defendant and Appellant. | [No change in the judgment] |

THE COURT:

It is ordered that the opinion filed in the above-captioned matter on August 13, 2013, be modified as follows:

1.  On page 17, line 3 of the last paragraph, the following sentences shall be deleted:

"He admitted picking her up and sitting her on the sink *after* "play[ing]" with her buttocks.  He committed no further sexual touching after placing her on the sink."

This modification effects no change in the judgment.

The petition for rehearing filed by Respondent on August 28, 2013, is denied.

_____
BIGELOW, P. J.              RUBIN, J.              FLIER, J.

Filed 8/13/13  P. v. Moncrea CA2/8 (unmodified version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANTHONY DAWAYNE MONCREA,<br><br>    Defendant and Appellant. | B238470<br><br>(Los Angeles County<br>Super. Ct. No. NA088032) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joan Comparet-Cassani, Judge.  Reversed.

G. Martin Velez, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Brendan Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Anthony Dawayne Moncrea of sexual battery by restraint. (Pen. Code, § 243.4, subd. (a).)  On appeal, Moncrea argues the trial court erred in admitting a prior act of sexual assault pursuant to Evidence Code section 1108,[1] failing to instruct in accord with *People v. Mayberry* (1975) 15 Cal.3d 143 (*Mayberry*), and failing to instruct on the lesser included offense of misdemeanor sexual battery.  We find the trial court prejudicially erred in failing to instruct on the lesser included offense and reverse.

## FACTS

In September 2010, D.V. (D.) and Moncrea were both living at the Substance Abuse Foundation in Long Beach, California.  D. had known Moncrea for about one month, and considered him an acquaintance.  D. was a "really friendly," "huggie-type" person who was energetic and "nice to everybody."  She was no friendlier with Moncrea than she was with others at the center.  She did not know that he liked her.

On the day of the incident, Moncrea told D. that he had something to show her but couldn't show her at their present location because there were others around.  They arranged to meet in the "medical room" after D. took her anti-depressant and anti-psychotic medications.  When D. arrived at the medical room, Moncrea was already waiting there.  No one else was around the medical room at this time.

Upon D.'s arrival, Moncrea put his arms out and she gave him a hug.  Moncrea then grabbed D.'s hips and motioned for her to turn around.  D. described this interaction as playful and that Moncrea was not strong-arming her or holding her in place.  Moncrea then tried to bend D. over and pull her pants down by placing two index fingers in the waistband of her pants.  D. took this to mean that Moncrea was trying to have sex with her, and she pulled up her pants, and told him "No."  She moved away from Moncrea to leave but was unable to open the door because Moncrea grabbed her by the hips and pulled her back.  D. no longer felt that this interaction was playful when Moncrea did not let her go.

---

[1] All further section references are to the Evidence Code except as otherwise noted.

Moncrea proceeded to try to bend her over again, and she continued to try to pull away. Moncrea picked her up in a bear hug and carried her through a hallway into a bathroom. During this time, D. tried to get away from Moncrea by squirming, pushing away, and asking him to let her go. However, she was unable to get away because of Moncrea's comparative size and strength. At the time of the incident, D. and Moncrea weighed approximately 100 and 200 pounds, respectively.

After they entered the bathroom, Moncrea set D. down, turned her around by the sink, and pulled her pants down below her buttocks. With D. facing the sink, Moncrea took his penis out of his shorts and touched it between her "butt cheeks." After Moncrea touched D. with his penis, she was able to pull away by moving forward and pulling up her pants because Moncrea "wasn't really using much force." D. turned around and told Moncrea, "No. Stop. I can't do this. I have a boyfriend."

Moncrea then got on his knees and indicated that he wanted to lick her vagina. D. told him to stop and mentioned that he was in the perfect position for her to knee him in the face. Moncrea stood up, picked D. up, sat her on the sink, and asked, "Why?" D. answered, "I just can't. I have a boyfriend." Moncrea asked D. if they would be able to "do it" if she didn't have a boyfriend. D. said, "I don't know; maybe." D. said "no" many times throughout the incident. She ran away after Moncrea carried her back into the hallway and set her down. The next day, D. had a friend report the incident to the police because the center had not reported it after she had told them about the incident.

Bobby Rendon, a resident of the Substance Abuse Foundation, was in the courtyard on the day of the incident and heard D. asking for help. Rendon turned around and saw Moncrea running away. He heard D. say somebody had tried to rape her. She was crying and appeared startled and scared.

Long Beach City Detective Hector Nieves investigated the incident. Detective Nieves spoke to Aaron Dutcher, who was employed at the Substance Abuse Foundation. Dutcher said he was near the medical office that day and saw Moncrea and D. enter the building. He heard the loud voice of a female seeming to need help. Dutcher later saw

3

D. by the gazebo. She was upset and crying. Dutcher overheard D. say Moncrea tried to rape her.[2]

In July 2011, the People filed an information charging Moncrea with felony sexual battery by restraint. (Pen. Code, § 243.4, subd. (a).) The charge was tried to a jury in December 2011. The prosecution's evidence established the facts summarized above. In addition, the trial court allowed the prosecution to admit evidence of a prior uncharged offense by Moncrea to show propensity under section 1108. The facts of the prior offense are set forth more fully below in discussing Moncrea's challenge to the evidence. Moncrea testified in his own behalf. His testimony is recounted in more detail below in addressing his claims on appeal; he largely testified that D. consented to his actions. In rebuttal, Detective Nieves testified he interviewed Moncrea; he admitted D.'s story was accurate, except he claimed D. consented. Jacqueline Harper, an employee of the Substance Abuse Foundation, said she did not call the police even though she heard about the incident from both D. and Moncrea. Harper said she did not call the police because she was trying to quell racial tensions in the facility and, in part, because D. did not ask her to do so.

Moncrea was found guilty as charged. The trial court sentenced him to state prison for the midterm of three years.

## DISCUSSION

### I. The Evidence of the Uncharged Offense

Moncrea contends his conviction for sexual battery by restraint must be reversed because the court abused its discretion in admitting evidence of an uncharged sex offense. We find the trial court abused its discretion by failing to sanitize portions of the evidence of the prior act, but find the error harmless.

---

[2] At trial, Rendon claimed he had no recollection of his conversation with Detective Nieves or any conversation about Moncrea and D.

4

### *The Governing Law*

Section 1101 states in part: "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act." Section 1108, subdivision (a) provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

Section 1108 is intended in sex offense cases to relax the evidence restraints that section 1101, subdivision (a), imposes, to assure that the trier of fact may be made aware of the defendant's other sex offenses in evaluating the credibility of the charged offense. "In this regard, section 1108 implicitly abrogates prior decisions of this court indicating that 'propensity' evidence is per se unduly prejudicial to the defense. (See, e.g., *People v. Alcala* (1984) 36 Cal.3d 604, 630-631.)" (*People v. Falsetta* (1999) 21 Cal.4th 903, 911.) As our Supreme Court stated in *People v. Villatoro* (2012) 54 Cal.4th 1152: "[T]he clear purpose of section 1108 is to permit the jury's consideration of evidence of a defendant's propensity to commit sexual offenses. 'The propensity to commit sexual offenses is not a common attribute among the general public. Therefore, evidence that a particular defendant has such a propensity is especially probative and should be considered by the trier of fact when determining the credibility of a victim's testimony.' [Citations.]" (*Id.* at p. 1164.)

We examine the admission of uncharged sex offenses evidence under section 352. (§ 1108, subd. (a); *People v. Loy* (2011) 52 Cal.4th 46, 63; *People v. Reliford* (2003) 29 Cal.4th 1007, 1012-1013.) Section 352 states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its

admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  Our review of a trial court's decision under section 352 is for an abuse of discretion.  (*People v. Avila* (2006) 38 Cal.4th 491, 578; *People v. Cole* (2004) 33 Cal.4th 1158, 1195.)  "A court abuses its discretion when its rulings fall 'outside the bounds of reason.'"  (*People v. Ochoa* (1998) 19 Cal.4th 353, 408, quoting *People v. DeSantis* (1992) 2 Cal.4th 1198, 1226; and see also *People v. Waidla* (2000) 22 Cal.4th 690, 714 [accord]; *People v. Fuiava* (2012) 53 Cal.4th 622, 663.)  "A trial court's exercise of discretion under section 352 will be upheld on appeal unless the court abused its discretion, that is, unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner.  (*People v. Williams* (2008) 43 Cal.4th 584, 634–635; [*People v.*] *Rodrigues* [(1994)] 8 Cal.4th [1060,] 1124, 1125.)"  (*People v. Thomas* (2012) 53 Cal.4th 771, 806.)

In *People v. Harris* (1998) 60 Cal.App.4th 727, 737-741 (*Harris*), the Court of Appeal for the Third Appellate District set forth five factors to be considered in making the sections 1108 and 352 determination.  They are the: the inflammatory nature of the uncharged acts evidence; the probability of confusing the jury; the remoteness in time of the uncharged act or acts; the consumption of time to introduce the evidence; and the probative value of the evidence.  (See also *People v. Hernandez* (2011) 200 Cal.App.4th 953, 965-966; *People v. Branch* (2001) 91 Cal.App.4th 274, 282.)  Similarly, in *People v. Falsetta, supra*, 21 Cal.4th 903, our Supreme Court held that in ruling on the admissibility of evidence under sections 1108 and 352: "[Trial courts] must engage in a careful weighing process . . . .  Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the

6

defendant's other sex offense, or excluding irrelevant though inflammatory details surrounding the offense.  [Citations.]"  (*Id*. at pp. 916-917.)

### *The Evidence*

The facts surrounding Moncrea's prior sex offense, which occurred four years before the offense charged in his current case, were as follows:  Moncrea was a family friend of Alexis.  At the time of the incident, Alexis and Moncrea were nine and fourteen years old, respectively.  Alexis was playing at her house near her siblings.  Moncrea pulled Alexis into her brother's room, pushed her face down on a mattress on the floor, and laid on top of her.  Alexis yelled, "Get off of me," and Moncrea dragged Alexis upstairs to her room.  Moncrea then pulled down Alexis's underwear and "skort" to her ankles.  Moncrea punched Alexis in the stomach in order to pull her pants down.

Moncrea approached Alexis from behind and went "up and down" on her, and put his penis in her anus.  Alexis began to yell because of the pain, and Moncrea covered her mouth.  Alexis began to kick Moncrea, and he told her to stop or it would take longer.  Alexis pushed Moncrea off her, pulled her pants up, and ran downstairs.

Moncrea chased after Alexis and stopped her from leaving by slamming the bedroom door and locking it.  Moncrea had a large kitchen knife and chased after Alexis, who was going to tell her brother what had happened.  Moncrea told Alexis that if she told anyone what happened he would cut her hands off.

Los Angeles Sheriff's Department Sergeant Doug Kimura interviewed Moncrea about the events with Alexis.  Moncrea said he was playing with Alexis when his penis fell out of his shorts.  He was "horny" and touched Alexis's buttocks, but only for a few seconds.  He was not certain if her pants were on.  Moncrea rubbed Alexis' breasts.  He admitted covering Alexis' mouth with his hand, punching her in the stomach and having a knife.  However, he said he only jokingly threatened to cut off Alexis' pinky.

At trial in his current case, Moncrea gave a slightly different version of the event.  He said he was playing with Alexis and became aroused.  He admitted taking her pants down against her will, but said his penis did not enter her anus.  Moncrea said he masturbated behind Alexis while she bent over.  He admitted he threatened Alexis with a

7

knife, and punched her but said he never cut her. Moncrea acknowledged he victimized Alexis, and that it was a "very wrong thing to do." He was sentenced for the incident, spent time in placement and went to counseling afterward. He testified: "I paid my dues . . . to her . . . . I went to counseling and did everything I had to do in the situation."

After Alexis's testimony, the court instructed the jury: "Evidence has been introduced for the purpose of showing that the defendant and this witness engaged in an act of sodomy on an occasion other than the crime alleged in this case. If you believe this evidence, you should consider it only for the limited purpose of tending to show the disposition or intent of the defendant towards this other person. You must not consider that evidence for any other purpose. It just goes to disposition or intent."

*Analysis*

Moncrea argues the evidence of the Alexis incident should have been excluded because it was "substantially more inflammatory" than the case being tried involving D. Moncrea claims admission of the evidence was prejudicial because the Alexis incident involved violent, sexual acts toward a nine-year-old, including punching and a threat of violence with a knife. We agree in part.

The Alexis incident was similar to the incident involving D. Both victims were vulnerable – Alexis was young and D. was in a substance abuse program, and taking anti-depressant and anti-psychotic medicine. Both victims were acquaintances of Moncrea, both lived in the same place as Moncrea, both victims were carried by Moncrea to secluded areas, and there was evidence that force was used to effectuate the assault. Most significantly, both incidents involved attempts to complete acts of sex in the area of the buttocks or anus of the victims. Thus, the trial court's decision not to exclude all evidence involving the Alexis incident was not an abuse of discretion.

Moncrea argues his case is similar to *Harris, supra,* 60 Cal.App.4th 727. In *Harris*, the prior sexual offense was not similar to the charged offenses and was far more prejudicial than in this case, but it still helps guide our analysis. In *Harris*, the Court of Appeal reversed the trial court's ruling admitting evidence of a prior offense on the basis that the defendant's prior crimes were "inflammatory in the extreme." (*Id*. at p. 738,

8

italics added.)  As the court described the charged incident in *Harris*: "[A]t worst defendant licked and fondled an incapacitated woman and a former sexual partner, both of whom were thereafter on speaking terms with him." (*Ibid*.)  In the uncharged incident: "[The defendant] entered [the victim's apartment] at night while she was sleeping, beat her unconscious and used a sharp instrument to rip through the muscles from her vagina to her rectum, then stabbed her in the chest with an ice pick, leaving a portion of the pick inside her.  Police found her beaten unconscious on the floor, bleeding heavily from the vaginal area and bleeding from the mouth and nose.  Defendant was found hiding nearby with 'blood on his hands, blood on his clothes, blood on his thighs, blood on his penis.'  When arrested he had a key ring on a finger and one of the keys fit the victim's apartment door." (*Id*. at p. 733.)  Additionally, the jury was not informed whether the defendant had been punished for the prior offense, leaving it with a distorted version of the prior case that caused the jury to be confused and speculate as to the outcome of that case.  (*Id*. at pp. 738-739.)  The appellate court reversed, finding prejudicial error.  (*Id*. at p. 741.)

Unlike in *Harris*, in which the two cases were too different to serve a probative purpose, here Moncrea's acts toward Alexis and D. were sufficiently similar to show propensity under section 1108.  In *Harris* the jury was left to speculate as to the outcome of the prior offense; here the jury had adequate knowledge of the outcome of the Alexis incident because Moncrea testified that he had "paid [his] dues . . . with respect [to] going to jail" and going to counseling.

But, like *Harris*, parts of the uncharged act involving Moncrea and Alexis were highly prejudicial.  In the uncharged offense, Moncrea procured a kitchen knife, used it to cut Alexis on her knee, punched her in the stomach and threatened her with the knife when she tried to tell her brother what happened.  He then told Alexis that he would cut off her hands if she told anyone about the incident.  The evidence of these facts involved in the Alexis incident could have been excluded from the testimony in Moncrea's current case involving the incident with D., as has been sanctioned by the California Supreme Court in *People v. Lewis* (2009) 46 Cal.4th 1255, 1285, footnote 18.  The failure to do so

9

was an abuse of discretion because the probative value of punch and knife-related facts was substantially outweighed by the potential for inflaming the jurors.

This brings us to the issue of prejudice. We find it was not reasonably probable that a result more favorable to Moncrea would have been reached absent the error in failing to limit the scope of the evidence concerning the Alexis incident. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) Moncrea argues that this error should be judged under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24, in which it must be shown beyond a reasonable doubt that this error did not contribute to the verdict. The only support Moncrea provides for this argument is a quote from *Falsetta* stating that section 352 "provides a safeguard that strongly supports the constitutionality of section 1108." (*Falsetta*, *supra*, 21 Cal.4th at pp. 916-917.) We do not find this convincing as to the standard of review vis-à-vis the evidentiary ruling at issue and errors of constitutional magnitude. As a general rule, "[t]he 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.'" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1010, quoting *People v. Brown* (2003) 31 Cal.4th 518, 545.) Rather, we find that any such error should be judged by the *Watson* standard, which looks to see if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1018-1019 [finding that "the erroneous admission of prior misconduct evidence does not compel reversal unless a result more favorable to the defendant would have been reasonably probable if such evidence were excluded"].)

Applying this test, we find a result more favorable to Moncrea was not reasonably probable had the punch and knife-related evidence of the Alexis incident been excluded at the trial of Moncrea's offense involving D. Moncrea argues the jury felt compelled to punish him for the Alexis incident because the jury was not provided any evidence explaining how the Alexis incident was resolved. We disagree. The jury had sufficient evidence to understand how the Alexis incident was resolved. Moncrea testified that he had "paid [his] dues . . . with respect of going to jail," and that he spent time in placement for the incident. We find no support for Moncrea's speculation that the jury in his current

10

case involving D. felt he needed additional punishment for his actions in the incident involving Alexis. The trial court instructed the jury that they were to "consider [the evidence of the Alexis incident] only for the limited purpose of tending to show the disposition or intent of the defendant towards this other person" and that they "must not consider that evidence for any other purpose."

Moncrea contends the Alexis evidence contributed to his conviction in his current case because the evidence against him was otherwise too weak to convict him of sexual battery by restraint. Moncrea points out that D. was flirtatious and playful with him prior to the incident. Additionally, D. described the initial interaction as playful. Finally, Moncrea stresses that D. told him that they would, "yes; probably" be able to "do it" if she did not have a boyfriend. We find this argument unconvincing.

As for Moncrea's interpretation of the incident as playful, playful does not equate with an invitation to sexual conduct. When D. understood Moncrea's intentions were sexual, she was no longer playful. Even Moncrea acknowledged that, as soon as he attempted to pull down D.'s pants, she moved away and said, "No." As to Moncrea's suggestion that D. expressed a willingness to have sex with him if she did not have a boyfriend, the record shows D. used the comment about a boyfriend to deter Moncrea's advances. In any event, her comments cannot be construed to be consent at that moment.

Finally, this case did not boil down to a straightforward, he-said-she-said factual dispute for the jury to decide. The jury had the benefit of the testimony of two people who saw D. immediately after the incident. Rendon heard D. crying for help, and heard her say someone tried to rape her. He noted she was startled, scared, and crying. Dutcher saw Moncrea and D. enter the building and heard a loud female voice seeming to need help. He too saw D. after the incident, upset and crying. He heard D. saying Moncrea tried to rape her. Here, there was an immediate statement about rape heard by two witnesses, although one (Dutcher) recanted at trial and said he could not remember. We also consider it significant that Moncrea was seen fleeing the scene. This is not the actions of a person who had consensual sex; flight from the scene of the crime is shows a consciousness of guilt. In light of these corroborative facts, we are satisfied that the error

11

in not sanitizing the evidence of the Alexis incident was not prejudicial. We cannot say that a result more favorable to the Maurico would have followed had the prejudicial portion of the prior acts been excluded.

## II. *Mayberry* Instruction

Moncrea argues the trial court had a sua sponte duty to give an instruction pursuant to the principles enunciated in the *Mayberry* case because Moncrea relied on a mistake of fact defense. He argues his conviction should be reversed because the trial court erred by not giving this instruction. We disagree.

At trial, Moncrea testified that, after D. rejected his initial attempt to pull down her pants, Moncrea turned her around, hugged her, and asked her to see her butt. D. appeared to laugh, shrug her shoulders, and say "I don't know." Moncrea asked D. to turn around and touch her toes. D. did so voluntarily, and Moncrea then "play[ed] with her butt." Moncrea testified he did not carry D. to the bathroom; he said she walked there voluntarily. After Moncrea asked whether they would be able to "do it" if she did not have a boyfriend, she answered "Yes; Probably." Moncrea did not carry D. out of the bathroom into the hallway. Instead, she left the room on her own.

Moncrea argues the *Mayberry* defense may be applied to the offense of sexual battery. The People tell us that they are "not aware" of any case in which a court ruled that the *Mayberry* defense applies to the offense of sexual battery. We assume without deciding that *Mayberry* may be applied in a sexual battery case, but find the instruction was not warranted under the facts of this case.

A sua sponte duty to give a *Mayberry* defense instruction arises "'"only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case."'" [Citations.]" (*People v. Maury* (2003) 30 Cal.4th 342, 424 (*Maury*), quoting *People v. Barton* (1995) 12 Cal.4th 186, 195.) The instruction "should not be given absent substantial evidence of equivocal conduct that would have led a defendant to *reasonably* and in good faith believe consent existed where it did not." (*People v. Williams, supra*, 4 Cal.4th at p. 362, italics added.) Here, the trial court had no duty to

12

give a *Mayberry* instruction because there was no evidence of equivocal conduct by D. to allow Moncrea to *reasonably* believe that she consented to his sexual touching.

In *Mayberry*, a defendant was charged with rape by means of force and threat, kidnapping and other offenses. (*Mayberry, supra*, 15 Cal.3d at pp. 146-147.) At trial, the prosecution presented evidence that the defendant compelled the victim to come to his apartment and have sexual intercourse with him. (*Id*. at pp. 147-149.) The defendant testified that the victim's conduct throughout the incident was voluntary. (*Id*. at p. 149.) He requested a special instruction that directed the jury to acquit him of rape and kidnapping if the jury had a reasonable doubt as to whether he "reasonably and genuinely believed that [the victim] freely consented to her movement [to the apartment] and to sexual intercourse with him." (*Id*. at p. 153.) The trial court declined to so instruct the jury. In ruling that this was error, our Supreme Court stated: "If a defendant entertains a *reasonable and bona fide belief* that [the victim] voluntarily consented to accompany him and to engage in sexual intercourse, it is apparent he does not possess the wrongful intent that is a prerequisite . . . to a conviction of either kidnapping [] or rape by means of force or threat[]." (*Id*. at p. 155, italics added.)

As our Supreme Court has subsequently explained: "The *Mayberry* defense has two components, one subjective, and one objective. The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse. In order to satisfy this component, a defendant must adduce evidence of the victim's equivocal conduct on the basis of which he erroneously believed there was consent. [¶] In addition, the defendant must satisfy the objective component, which asks whether the defendant's mistake regarding consent was reasonable under the circumstances. Thus, regardless of how strongly a defendant may subjectively believe a person has consented to sexual intercourse, *that belief must be formed under circumstances society will tolerate as reasonable* in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction. [Citations.]" (*People v. Williams* (1992) 4 Cal.4th 354, 360-361, fn. omitted, italics added.)

13

Any "playful," "flirtatious," or "huggie-type" actions by D. towards Moncrea were not equivocal conduct indicating consent under the objective element of *Mayberry*. A hug is not equivocal conduct indicating consent to sexual activity. While Moncrea may have interpreted D.'s behavior to convey sexual interest, such a belief was not formed under circumstances that may be tolerated as reasonable. Though the testimony of Moncrea and D. varied in minor aspects as to the initial nature of their encounter, even Moncrea testified that, when he tried to pull D.'s pants down, she said, "No, I have a boyfriend."

Even if we consider Moncrea's version of events — that, after he touched his penis between her butt cheeks, D. had said that, "yes," they would "probably" have been able to "do it" if she didn't have a boyfriend, this answer did not indicate consent to the act of sexual contact already accomplished, and we find no evidence of equivocal conduct by D. to have allowed Moncrea to reasonably believe she consented to his sexual advances. Therefore, the trial court had no sua sponte duty to instruct on the *Mayberry* defense.

Moncrea relies on *People v. Sojka* (2011) 196 Cal.App.4th 733 (*Sojka*) to support his position. In *Sojka*, the court found the trial court's failure to instruct the jury on the *Mayberry* defense was prejudicial. (*Id.* at p. 740.) In that case, the defendant and the victim met in a bar. They were friendly with one another over the course of the evening, socializing with other patrons, drinking and playing pool until about midnight. During this time period they were "mildly amorous" with one another. The defendant gave the victim a ride home and they kissed and caressed on the other for approximately 15 minutes. The victim testified she was not apprehensive about the defendant but did not recall the 15-minute interlude. They went into the victim's apartment, and defendant thought they might have sex. At this point, their accounts of what happened varied. The victim testified that, after arriving back at her apartment, she went to the bathroom. When she came out, defendant was completely naked and he forced himself on her. She said the defendant removed her clothes, digitally penetrated her, and performed oral sex on her while she continuously objected and resisted. She testified that the defendant

14

left after attempting to have her perform oral sex on him and participate in sexual intercourse. (*Id.* at pp. 735-736.) The defendant testified that the victim did not resist his initial advances, and the two engaged in the sexual acts voluntarily. (*Id.* at p. 736.) He testified that he left immediately after the victim resisted his attempts to engage in sexual intercourse. (*Ibid.*) The court found: "Given the events that occurred over the course of the evening, and [the appellant's] testimony of what occurred in the victim's apartment, the jury should have been instructed on [the defendant's] reasonable good faith, but mistaken, belief in her consent to sexual intercourse." (*Id.* at pp. 737-738.)

We find Moncrea's current case dissimilar. In *Sojka*, the events prior to the incident had led the defendant to reasonably believe that the victim might be willing to have sex with him, i.e., an objective person could have believed the victim might be willing to have sex. The two spent an evening together during which they were friendly and affectionate. They both voluntarily went into the victim's apartment. Unlike *Sojka*, Moncrea's mistaken belief that D. consented was not reasonable. They did not spend an affectionate evening together preceding a sexual encounter after entering the victim's apartment. Moncrea acknowledged that the victim told him no when he started to make sexual advances.

Moncrea reliance on *People v. May* (1989) 213 Cal.App.3d 118 (*May*) is also misplaced. In *May*, the court held that the trial court's failure to instruct the jury on the *Mayberry* defense was prejudicial to the appellant. (*Id.* at p. 128.) There, the victim met the May in a bar and engaged in a pleasant conversation, after which May bought her drinks. The victim excused herself from their table and went to the restroom to snort cocaine. May told her he could get her more cocaine and the victim accepted the offer. She admitted she was attracted to May and left the bar with him. They went to two more bars and continued drinking. They two then went to May's apartment. Again, it is at this point that the victim and May's testimony differed. The victim indicated she rebuffed all of May's advances; May contended they were flirting, giggling and that the victim tried to orally copulated him in exchange for money. The defendant testified that the two got into a physical altercation while arguing over payment for the sex act. (*Id.* at p. 124.)

15

Even the victim's version of the sexual encounter did not demonstrate an unequivocal lack of consent. Further, May's father testified that the two came into the apartment holding hands and whispering. After the victim whispered in May's ear, the two went into the bedroom and exited 15 to 20 minutes later, fully dressed. May's father did not see or hear a confrontation. (*Id.* at pp. 125-126.) The court found that the trial court should have provided the *Mayberry* defense because the jury could have concluded that the defendant had a reasonable and good faith belief that the victim consented. (*Id.* at pp. 127-128.)

Again, we find Moncrea's current case dissimilar. In *May*, the court found the victim's testimony about the behavior "from the time she met him at [the bar] to their encounter in the kitchen had all the characteristics of a "'casual pickup.'" (*May, supra,* at p. 125.) Unlike *May*, there were no extended events leading up to the encounter that would indicate D. was intending to have sex with Moncrea. Moncrea admitted D. told him "no" when he attempted to pull down her pants. Because the facts as shown by Moncrea's own testimony showed there was no ambiguous conduct over the course of an evening leading up to the sexual encounter and because he further acknowledged that D. indicted she did not want Moncrea to take her pants down, we find that the trial court had no duty to instruct on the *Mayberry* defense.

## III.    Instruction on Misdemeanor Sexual Battery

Last, Moncrea argues the trial court prejudicially erred by failing to instruct sua sponte to instruct on the lesser included offense of misdemeanor sexual battery. We agree.

A trial court errs when it "fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*); *People v. Avila* (2009) 46 Cal.4th 680, 704-705.) In other words, a trial court has a duty to instruct sua sponte on lesser included offenses "when the evidence raises a question as to whether all of the elements of the charged offense were present." (*People v. Lewis* (1990) 50 Cal.3d 262,

16

276.) However, the court "has no such duty when there is no evidence that the offense was less than that charged." (*Ibid*.) Evidence is substantial for this purpose if it would cause a reasonable jury to conclude that the defendant committed the lesser but not the greater offense. (*Breverman, supra*, 19 Cal.4th at p. 162.) "In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury." (*Ibid*.) We apply a de novo standard of review to the trial court's failure to instruct on an assertedly lesser included offense. (*People v. Licas* (2007) 41 Cal.4th 362, 366.)

Both parties acknowledge that misdemeanor sexual battery is a lesser included offense to felony sexual battery by restraint. The difference between the two charges is whether the sexual battery occurred "while that person is unlawfully restrained by the accused or an accomplice." (Pen. Code, § 243.4(a).) Therefore, if the evidence raises a question as to whether Moncrea "unlawfully restrained" D. during the incident, then the trial court had a duty to instruct on the lesser included offense. "'Unlawful restraint' occurs when, without consent, a person's liberty is controlled by the words, acts or authority of another." (CALJIC No. 10.37; and see also CALCRIM No. 935 ["Someone is unlawfully restrained when his or her liberty is controlled by the words, acts, or authority of another and the restraint is against his or her will"].)

Moncrea argues there is a question as to whether he restrained D. during the incident. We agree. Moncrea's testimony was that he never restrained D. during any sexual touching. He admitted picking her up and sitting her on the sink *after* "play[ing]" with her buttocks. He committed no further sexual touching after placing her on the sink. A trial court does not consider the credibility of witnesses in making the determination of whether to instruct on a lesser included offense. The jury should have been allowed the opportunity to consider whether to accept Moncrea's version of the events – that he did not restrain her. We cannot say this error was non-prejudicial. There were only two people present in the medical room when the assault took place. As to whether unlawful restraint was used during the assault, this issue is a classic he-said-she-said. The jury

may well have believed D. that a sexual battery occurred, but concluded that Moncrea did not restrain her during the course of the battery.

## DISPOSITION

The judgment is reversed.

BIGELOW, P. J.

We concur:

RUBIN, J.

FLIER, J.